**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 25-57-DLB**

**CLEON RILEY**                                                                                 **PETITIONER**

**v.**                          **MEMORANDUM OPINION and ORDER**

**CHRISTOPHER ENTZEL, WARDEN**                                          **RESPONDENT**

\*\*\* \*\*\* \*\*\* \*\*\*

Federal inmate Cleon Riley filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging the imposition of disciplinary sanctions against him.  (Doc. # 1).  The petition is fully briefed, *see* (Doc. # 8, # 12), and ripe for decision.

## I.  FACTUAL BACKGROUND

On May 4, 2024, a prison officer searched Riley's person and found a small clear plastic bag containing a small amount of tobacco and a piece of soaked paper.  *See* (Doc. # 8-1 at 10).  Another officer tested the paper using a Narcotics Identification Kit ("NIK"). The officer first tested the paper using NIK test Kit A; he reported that the reagents turned brown, a positive result for amphetamine.  *See id*.  The officer next tested the paper using NIK test Kit U; the reagents turned burgundy, a confirming positive result for amphetamine.  The officer finally tested the paper using NIK test Kit W; the reagents turned yellow, a confirming positive result for amphetamine.  *See id*.; *see also* (Doc. # 8-1 at 37-38).  An Incident Report was issued charging Riley with possession of narcotics, a Code 113 violation, as well as possession of a non-hazardous tool, a Code 331 violation, for the tobacco.  *See* (Doc. # 8-1 at 10-12).

1

Approximately two weeks later, a re-written Incident Report was issued.  *See* (Doc. # 8-1 at 13-15).  The most noticeable differences are in the officer's description of two of the three NIK test results.  Both the original and re-written Incident Report stated that the solution in NIK test Kit U "turned burgundy."  However, the results of NIK test Kit A were described as "turned brown in color" in the original report but were changed to "turned Orange in color and then turned brown in color" in the re-write.  Similarly, the results of NIK test Kit W were described as "turned yellow" in the original report but as "turned olive-green" in the re-write.  *Compare* (Doc. # 8-1 at 10) *with* (Doc. # 8-1 at 13).

A Disciplinary Hearing Officer ("DHO") held a hearing on that charge two weeks later on June 6, 2024.  *See* (Doc. # 8-1 at 18).  Riley denied guilt at the hearing.  *See id*. Relying upon photographs of the contraband, *see* (Doc. # 8-1 at 34-35), as well as the investigating officer's report of the NIK test results, *see id*. at 19, the DHO found Riley guilty of the charges.  *See id*. at 19-20).  The DHO issued his Report imposing various sanctions including the disallowance of good conduct time.  *See* (Doc. # 8-1 at 21).

Riley appealed his disciplinary conviction on numerous grounds.  One of his arguments was based upon the variation in the "colors reported, and the description of the substance tested" between the original and re-written Incident reports.  *See* (Doc. # 8-1 at 58-59).  The Regional Office affirmed his conviction, responding to that particular claim as follows:

> The discipline record indicates the incident report was properly rewritten to include additional information regarding the color change of NIK test kit A. This was necessary to ensure you were provided adequate notice of the charge against you, and to ensure your due process rights were upheld.

(Doc. # 8-1 at 60-61).  The Central Office affirmed on the same ground upon further appeal.  *See* (Doc. # 8-1 at 45-46).

## II. DISCUSSION

Riley's petition for relief is grounded upon "several inconsistencies (fabrications) between the initial incident report and the re-written incident report." (Doc. # 1-1 at 9). Specifically, Riley contends that the Incident Report was re-written so that the description of the colors observed by the officer conducting the NIK tests more closely matched those described in the NIK testing documentation to indicate a positive result for amphetamines. *See* (Doc. # 1-1 at 9-12). He implies that the description of the test colors amounted to a fabrication of evidence. *See id*. at 12-13.[1]

When a prisoner believes that he was deprived of sentence credits for good conduct without due process of law, he may invoke this Court's habeas corpus jurisdiction under 28 U.S.C. § 2241. *Preiser v. Rodriguez*, 411 U.S. 475, 487-88 (1973). Before such credits are taken, due process requires that the inmate be given:

(1)    written notice of the charges against her at least 24 hours before the administrative hearing on the charges;

(2)    a hearing before an impartial decision-maker;

(3)    assistance from a competent inmate or staff member, if the inmate requests one and she will likely be unable to present a defense because she is illiterate or the case is too complex for her to comprehend;

(4)    the opportunity to call witnesses and present documentary evidence, if doing so would not jeopardize institutional safety or correctional goals; and

(5)    a written statement by the hearing officer explaining the evidence relied upon and the basis for the decision.

---

[1]  Riley also briefly complains that the two versions of the Incident Report described the substance soaked into the paper, before it was tested, in different ways. *See id*. But unlike his challenge to the varied descriptions of the test results themselves, he fails to ascribe anything meaningful to that difference in language, nor can the Court discern any. This aspect of the petition fails to establish any ground for relief.

*Wolff v. McDonnell*, 418 U.S. 539, 564-70 (1974).  The Bureau of Prisons has included these and even broader protections by regulation.  *See* 28 C.F.R. §§ 541.5 - 541.8; BOP Program Statement 5270.09 (Nov. 2020).  However, an agency's failure to strictly comply with its own policies does not violate due process.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985); *United States v. Rutherford*, 555 F.3d 190, 192 (6th Cir. 2009) ("[T]he Constitution does not demand a bright-line rule whereby every breach of federal administrative policy also violates the Due Process Clause.").  Due process also requires the prison disciplinary board's decision to be supported by "some evidence" in the record.  *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985).

Riley does not challenge the results of the NIK tests *per se*.  Instead, he contends that the language used in the re-written Incident Report is evidence of fabrication because the wording used to describe the test results more closely tracks that found in the NIK test documentation to describe a positive test result.  *See* (Doc. # 1-1 at 9-12).  Whether the testing officer's description of the colors perceived during the NIK testing should be believed or not is a credibility determination for the DHO to make.  Thus, Riley's challenge to the positive NIK test result questions the sufficiency of the evidence used to convict him.  *See Barrie v. Warden, FCC Coleman*, 840 F. App'x 508, 509 (11th Cir. 2021).  A reviewing court's task is only to confirm that "there is *any evidence* in the record that could support the conclusion reached by the disciplinary board."  *Hill*, 472 U.S. at 454-55 (emphasis added).  Because of the low threshold to meet the "some evidence" standard, a reviewing court need not re-examine the record, independently assess the credibility of witnesses, or weigh the evidence.  *Selby v. Caruso*, 734 F. 3d 554, 559 (6th Cir. 2013).

4

Here, the DHO could readily conclude that the description of the NIK test results in the re-written Incident Report was clarifying rather than fabricated.  After all, and as noted by the warden, *see* (Doc. # 8 at 6), the testing officer's decision to proceed to NIK Test Kit U only made sense if the NIK Test Kit A solution had first turned orange and then brown.  *See* (Doc. # 8-1 at 37 ("IdentiDrug Chart for use with the NIK Polytesting System")).  As the Court has noted before, "if the sample had turned to brown directly, the IdentiDrug Chart indicates that NIK Test I or NIK Test B would have been used to test for the drugs AMT or MDA."  *Roper v. LeMaster*, Case No. 24-cv-104-DLB (E.D. Ky. July 2, 2025) (Doc. # 11 therein at 8).  Thus, the testing sequence actually followed by the lieutenant itself strongly supports the statement in the re-written Incident Report that the test solution "turned Orange in color and then turned brown in color."[2]

Likewise, merely changing the color description for the third test from "yellow" to "olive green" did not deprive the DHO of a viable factual basis to conclude that the tests established that Riley possessed amphetamines.  As noted by the warden, the colors depicted on the IdentiDrug Chart could be described in various ways.  For example, the "burgundy" color described in both Incident Reports for Test U is actually described generically as "red" at one place in the IdentiDrug Chart.  *See* (Doc. # 8-1 at 37 n.2).  And

---

[2]  This is emphasized by the NIK testing system's directions.  The vendor acknowledges at the outset that "[c]olorimetric testing is not foolproof", but explains that:

> The NIK Polytesting System of Narcotics Identification is based upon a polytesting procedure whereby a suspect material is subjected to a series of progressively discriminating screening tests.  The results of individual tests may or may not yield a valid result.  However, the sequential results of several tests provide a higher degree of certainty that the suspect material is in fact what the NIK Polytesting System indicates it to be.

(Doc. # 8-1 at 38).

as with the second test conducted in the series, the third test in the series – Test W – was conducted in conformity with the IdentiDrug Chart following a positive "burgundy" result at the step before.  Whether described as "yellow" or "olive green", the result was sufficiently close to the color depicted in the chart to warrant a conclusion that the sample tested positive for amphetamine at the conclusion of "a series of progressively discriminating screening tests."  Because the DHO's decision was amply supported by "some evidence," the petition will be denied.

Accordingly, it is **ORDERED** as follows:

1.      The petition **(Doc. # 1)** is **DENIED.**

2.      This matter is **STRICKEN** from the docket.

This 22nd day of April, 2026.

**Signed By:**

**David L. Bunning**

**Chief United States District Judge**

G:\Judge-DLB\DATA\ORDERS\PSO Orders\Riley 0-25-57 Opinion.docx

6